IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

IN THE MATTER OF THE SEARCH OF
THE FOLLOWING TWELVE CELLULAR
DEVICES SEIZED FROM MARIO
ADONTE CRAWLEY AND CURRENTLY
LOCATED AT THE ATF MARTINSBURG
FIELD OFFICE IN MARTINSBURG, WEST
VIRGINIA:

WHITE AND BLACK APPLE IPHONE
WITH BLACK CASE

BLACK SAMSUNG CELLPHONE
BEARING IMEI: 351783150889042

BLACK AND GREY SAMSUNG
CELLPHONE BEARING IMEI:
355563579611417

BLUE AND BLACK MOTOROLA
CELLPHONE MODEL XT2215-1

BLUE AND BLACK MOTOROLA
CELLPHONE MODEL XT2317DL
BEARING SERIAL NUMBER
352398200783894

BLACK APPLE IPHONE

BLACK APPLE IPHONE WITH CRACKED
SCREEN

BLUE AND BLACK MOTOROLA
CELLPHONE WITH CRACKED SCREEN

BLUE AND BLACK BLU PRODUCTS
TRACFONE MODEL VIEW 3

BLACK TCL CELLPHONE WITH
CRACKED SCREEN BEARING IMEI:
016062001774076

| |
|---|
| GREY AND BLACK SAMSUNG GALAXY S4 CELLPHONE |
| BLUE AND BLACK APPLE IPHONE WITH CRACKED SCREEN AND BACK |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Lauren Scoll, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—twelve electronic devices—which are currently in law enforcement possession and further described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2. I became a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in March 2005. I had a voluntary break in service in 2013, and I was reinstated in February 2021. I am a graduate of the Criminal Investigator Training Program and ATF's Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia. This included training in the investigative techniques of criminal violations of the Gun Control Act (18 U.S.C ch. 44) and the National Firearms Act (26 U.S.C. ch. 53). Prior to becoming a Special Agent, I was an investigator for a private investigation firm and an ATF Industry Operations Inspector in California. I have a Bachelor of Arts in Communication Disorders and Sciences from California State University, Northridge.

3. I have conducted covert surveillance of suspected firearms and controlled

dangerous substances ("CDS") traffickers, interviewed individuals regarding the firearms/CDS trafficking trade, participated in the execution of numerous state and federal search warrants, and participated in the seizure of numerous firearms and CDS. Through my training, education, and experience, I have become familiar with the manner in which illegal firearms and CDS are transported, stored, and distributed, and the manner in which firearms and CDS traffickers communicate with each other. Through my training, education, and experience, I have also become familiar with use of firearms in CDS trafficking and usage.

4. Through my training and experience, I have become familiar with the methods of operations typically utilized by individuals who distribute firearms and CDS. I know that it is common practice for firearms and CDS traffickers to routinely utilize telephones, mobile phones, prepaid phones, text messaging, counter-surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement. Moreover, it is not unusual for these subjects to register services such as telephones or vehicle registration in the name of an associate or other family member or in the name of a fictitious individual.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) and 21 U.S.C. § 841(a)(1) have been committed by the individual known to law enforcement as Mario Adonte CRAWLEY ("CRAWLEY"), and evidence of these violations are in the property to be searched in Attachment A. There is also

probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

7. The property to be searched are twelve cellular devices: white and black Apple iPhone with black case; black Samsung cellphone bearing IMEI: 351783150889042; black and grey Samsung cellphone bearing IMEI: 355563579611417; blue and black Motorola cellphone Model XT2215-1; blue and black Motorola cellphone Model XT2317DL bearing IMEI: 352398200783894; black Apple iPhone; black Apple iPhone with cracked screen; blue and black Motorola cellphone with cracked screen; blue and black Blu Products Tracfone Model View 3; black TCL Cellphone with cracked screen bearing IMEI: 016062001774076; grey and black Samsung Galaxy S4 cellphone; blue and black Apple iPhone with cracked screen and back, referred to hereinafter as "**the Devices**." **The Devices** are currently located at the ATF Martinsburg Field Office's evidence vault in Martinsburg, Berkeley County, West Virginia.

8. The applied-for warrant would authorize the forensic examination of **the Devices**, as described in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

*Overview of Investigation*

9. On September 22, 2023, Berkeley County Sheriff's Office (BCSO) Sheriff N. Harmon received information from a bail bond company that a wanted female with several warrants, identified as Lindsey Nicole KERN, was planning a meeting with her father at the Sheetz convenience store located at 3728 Charles Town Road, Kearneysville, WV. Sheriff

Harmon was further advised that KERN was traveling with a male known for distributing illegal narcotics and could possibly be armed.

10. After learning of this information the Sheriff contacted members of the Accelerated Criminal Enforcement Team, along with patrol shift units and a member of the Mountain State Fugitive Task Force. At approximately 2006 hours, KERN along with a male driver, later identified as Mario Adonte CRAWLEY, arrived in the parking lot in a blue Saturn SUV, bearing a Maryland registration 14719CK. A query of Maryland license plate 14719CK identified the license plate as being associated with a 2004 Ford F150, and not a Saturn SUV. A registration query of the Saturn's VIN #3GSCL53749S56488, identified the vehicle as being a 2009 Saturn registered to Wybles Used Cars, 864 W. Main Street, New Holland, PA 17557.

11. Once the vehicle was parked, officers removed the occupants. KERN was placed under arrest due to her outstanding warrants, and CRAWLEY was detained and brought back to stand in front of a patrol vehicle. Dep. Shockey requested driver's licenses and warrant checks on both CRAWLEY and KERN. That check would show that CRAWLEY was under probation and supervised release through the District of Columbia.

12. During a search of KERN's person and the property she had on her, Dep. Price located several illegal narcotics believed to be heroin, fentanyl, and marijuana. A search was then conducted of CRAWLEY's vehicle. In the vehicle's rear cargo area, Dep. Jenkins located a black shopping bag that contained a black and silver Poly80, 9mm caliber, Privately Made Firearm (PMF) handgun with a loaded magazine. The handgun had no serial numbers and the slide of the firearm appeared to be an aftermarket slide. CRAWLEY was placed under arrest.

13. A query of CRAWLEY's criminal history was requested through Berkeley County Dispatch and that check showed that he had several felony convictions for violent crimes.

14. Also located in the rear cargo area in a hidden compartment, Dep. Shockey located a black bag that contained a Gillette Shaving Cream Can with a false twist cap bottom that was hollow inside and contained four (4) clear bags of illegal narcotics believed to be heroin and fentanyl. In another case, a clear baggy was located with suspected crack cocaine. A digital scale was also inside the bag. Twelve (12) cellular phones were seized from the vehicle.

15. Once the on-scene investigation was completed, KERN, CRAWLEY, and the evidence seized were transported to the BCSO for processing. At the BCSO, the narcotics were weighed to be approximately 2.6 grams of suspected crack cocaine, 17.2 grams of suspected heroin, and 50.2 grams of suspected fentanyl. After weighing the illegal narcotics, they were placed into evidence along with the firearm and the magazine with ammunition.

16. When the arrest processing was completed, KERN and CRAWLEY were transported to the Eastern Regional Jail.

*CRAWLEY's Criminal History*

17. A National Crime Information Center (NCIC) criminal history records search revealed that CRAWLEY was convicted of felony Receiving Stolen Property in the Circuit Court of Chesterfield County, Virginia (Case #CR90F01258-01) on February 1, 1991; felony Attempted Robbery in the Circuit Court of Petersburg, Virginia (Case# CR93000246-01) on September 14, 1993; and felony Armed Robbery in the Superior Court of the District of Columbia (Case #1999FEL000587) on May 26, 1999. CRAWLEY is currently on supervised release following his release from prison on November 10, 2021, after serving approximately twenty-two years for the Armed Robbery conviction.

*DEA Laboratory Analysis*

18. On November 14, 2023, I took possession of the narcotics seized from CRAWLEY at the time of his September 22, 2023 arrest and submitted the items to the Drug Enforcement Administration (DEA) Mid-Atlantic Laboratory for analysis. The laboratory analysis resulted in the confirmation of approximately 37.369 grams of fentanyl, approximately 10 grams of cocaine, approximately 1.5 grams of cocaine base, and approximately 22.66 grams of quinine, a known cutting agent.

*ATF Arrest of CRAWLEY*

19. On January 24, 2024, ATF Agents with the Martinsburg Field Office conducted an arrest operation to take CRAWLEY into custody at the Court Services and Offender Supervision Agency (CSOSA), located at 910 Rhode Island Avenue NE, Washington, DC 20018. CRAWLEY had an active federal arrest warrant out of the Northern District of West Virginia (Case # 3:24-CR-8). At the time of his arrest, CRAWLEY had a CashApp card bearing the user identification "$godspeed169" on his person.

**The Devices' Location**

20. **The Devices** are currently in the lawful possession of the ATF. **The Devices** came into BCSO possession when seized during the arrest of CRAWLEY on September 22, 2023. I took custody of **the Devices** on behalf of the ATF on February 6, 2024.

21. I seek this warrant for an examination of **the Devices**, which will comply with the Fourth Amendment and other applicable laws.

22. **The Devices** are currently in storage at the ATF Martinsburg Field Office in Martinsburg West Virginia, which is within the Northern District of West Virginia. In my training and experience, I know that **the Devices** have been stored in a manner in which their contents are,

to the extent material to this investigation, in substantially the same state as they were when **the Devices** first came into the possession of the ATF and BCSO.

## **TECHNICAL TERMS**

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of

fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated tophotographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices

and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing dataand a keyboard and/or touch screen for entering data. Removable storage mediainclude various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. Forexample, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same

state.

24. Based on my training, experience, and research, I know that **the Devices** have capabilities that allow them to serve as wireless telephones, digital cameras, GPS navigation devices, and PDAs**.** In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used **the Devices**.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how **the Devices** was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on **the Devices** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of **the Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of **the Device** to human inspection in order to determine whether it is evidence described by the warrant.

28.     *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29.     Due to the seizure of a large quantity of fentanyl, cellular phones, digital scale, CDS packaging materials, and a Privately Made Firearms (PMF) with no serial number, it is suspected that CRAWLEY is involved in Controlled Dangerous Substance (CDS) trafficking. In my training and experience, I know that CDS traffickers will often utilize firearms as a means of protecting their CDS and proceeds from CDS sales.

30.     In my training and experience, I know that persons that engage in CDS trafficking, or that take receipt of CDS and firearms, utilize their cellular devices to engage in said business. Cellular devices are used as a daily means to contact customers and also contact suppliers. These communications are used to further and facilitate the redistribution of CDS.

31.     Additionally, I know from my training and experience that a smartphone is used to provide GPS directions native or secondary application to **the Devices**. The location of **the Devices** is often logged during the communication with the cellular network and the satellites and embedded within **the Devices**. I know from my training and experience with cellular phone examinations that persons often utilize GPS based applications to provide directions, even when traveling on foot. I also know that photographic content within **the Devices** often contain metadata which can log GPS coordinates or locational data. I know from training and experience that often times this data will be supported by GPS data within **the Devices.**

32. A physical search of the contents of **the Devices** is only a search analysis of the data contained within **the Devices** and not the cellular provider data which would be obtained through a separate legal demand. It is anticipated that GPS location information will be located in **the Devices.**

33. I respectfully submit this affidavit which supports the same probable cause for a search warrant authorizing the examination of **the Devices** described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

**LAUREN SCOLL**
Digitally signed by LAUREN SCOLL
Date: 2024.02.12 14:43:21 -05'00'

Lauren Scoll
Special Agent
Bureau of Alcohol, Tobacco, Firearms & Explosives.

Subscribed and sworn to before me on February 12, 2024

UNITED STATES MAGISTRATE JUDGE
ROBERT W. TRUMBLE